# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 15, 2003 Session

## STATE OF TENNESSEE v. WILLIAM RHEA JACKSON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-D-2190     Steve Dozier, Judge**

---

**No. M2002-00762-CCA-R3-CD - Filed March 27, 2003**

---

The Defendant, William Rhea Jackson, was convicted by a jury of aggravated burglary, robbery, misdemeanor theft, attempted rape, aggravated kidnapping, and two counts of rape. The trial court sentenced the Defendant to an effective term of thirty-four years in the Department of Correction. In this direct appeal, the Defendant raises eight issues: (1) whether the trial court erred in denying his motion to suppress his statement to the police; (2) whether the trial court erred in admitting certain testimony concerning fingerprints; (3) whether the trial court erred in admitting hearsay testimony about the victim's response to a photographic line-up; (4) whether the Defendant was entitled to a mistrial due to statements made by the prosecutor during closing argument; (5) whether the evidence is sufficient to support his convictions; (6) whether the conviction for aggravated kidnapping violates due process under State v. Anthony; (7) whether the trial court properly instructed the jury concerning lesser-included offenses; and (8) whether the Defendant's sentences are excessive. Because the trial court committed reversible error when it failed to instruct the jury on all of the lesser-included offenses of the indicted offenses of robbery and aggravated rape, we reverse and remand for retrial the Defendant's convictions of robbery and rape. In all other respects, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part; Reversed in Part; Remanded**

DAVID H. WELLES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Jeffrey A. DeVasher, Assistant Public Defender, Nashville, Tennessee, for the appellant, William Rhea Jackson.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Renee Erb and Kristen Shea, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The victim in this case, a widow in her early eighties, testified that on the morning of September 9, 2000, she heard a knock at her door. She lived in a house by herself on South Eleventh Street in Nashville. When she opened the door, a black male covered her face with something and asked where her money was. The man took her by the arm and pushed her down on her bed. He covered her head with a pillow and again asked where her money was.

As the victim lay on her bed, the man rummaged through her house. After about thirty minutes, she testified, the man returned to her bedroom, pulled up her gown, got on top of her, and inserted his finger into her rectum. He then got up, again asked about her money, and left the room.

The man returned some time later, still asking about the victim's money. He got on top of her again and took four rings off of her fingers and a necklace off of her neck. He then put his penis in the victim's face, demanding that she "suck it." The victim refused, and her attacker twice repeated his demand, but the victim did not comply. The victim testified that the man then grabbed a pillowcase, put it over her head, and tied her hands behind her back. He got on top of her again, rubbed his penis on her body, and again inserted his finger into her rectum. He then got up and left the room.

The victim heard her attacker still in the house. Again, he returned to the bedroom, and again he demanded to know where the victim's money was. He then tied the victim's feet together and asked her if she was going to have company. When she replied, "yes," he then asked, "when?" The victim told the man, "now," and he finally left the house. The victim testified that the entire episode lasted approximately two hours.

When the victim realized that her attacker had left, she removed the pillowcase from her head and managed to get across the street to a neighbor. The neighbor untied the victim's hands, and she returned to her house, discovering that her car was gone. She called the police.

The victim testified that, in addition to her car and jewelry, she was missing her VCR, three pocketbooks, and a large sport bag. The victim testified that she had heard the man rummaging through her house, opening drawers, and pulling the top off of a large popcorn tin in her bedroom. She explained that this tin had been given to her, probably at Christmastime in 1999. Officer Charles Anglin subsequently recovered a latent thumbprint from the popcorn can, using the brush and powder technique. Loreta Marsh, a fingerprint examiner with the Metro Police Department, testified that this latent print matched the Defendant's left thumbprint. Julie Hooper, Ms. Marsh's supervisor, also examined the latent print and verified that it matched the Defendant's.

A latent print was also obtained from the victim's car after it was discovered abandoned in another county. This print did not match the Defendant and was never identified.

After the fingerprint match was obtained, Detective Julie Lawson prepared a photographic line-up of six black men, including a photograph of the Defendant. She showed this line-up to the victim at the victim's home. Det. Lawson testified that, upon viewing the six photographs, the victim said that she could "narrow it down to one of [photographs one, three and six]," stating, "one of those is him." The victim was unable to further identify her attacker; however, photograph number one in the line-up was of the Defendant. When asked to look at the Defendant at trial, the victim stated that, to her knowledge, she had never seen him.

After the Defendant was taken into custody on September 14, 2000, on unrelated charges, Det. Lawson and Detective Keith Sutherland met with the Defendant for the purpose of interviewing him about the attack on the victim. Det. Lawson testified at trial that while she was reading the Defendant his Miranda rights, the Defendant interrupted her by saying that he wanted to know what the allegations were. Det. Lawson testified that she told the Defendant she would tell him what the allegations were but that she had to finish with his rights, first. She continued reading from the rights waiver form, took some personal information from the Defendant, and then explained the basic facts of the attack. She asked the Defendant to sign the rights waiver. Det. Lawson explained that the Defendant refused to sign the waiver and kept asking what people were saying about him. Det. Lawson again read the Defendant his rights. He told her that he would talk with her if she didn't tape-record the conversation. Det. Lawson agreed and then told the Defendant about the evidence the police had collected at that point, including the victim's report and the matching fingerprint. According to Det. Lawson, the Defendant responded by stating, "I've fucked up. I've messed my life up." The Defendant made no further statements concerning the case.

When he was taken into custody, the Defendant had a pawn ticket in his pocket. Further police investigation revealed that a pawn ticket to William R. Jackson had been issued by Household Pawn Number One in Nashville on the afternoon of September 9, 2000. This pawn ticket indicated that a necklace and three rings had been pawned. Raymond Houser testified that he was the pawn-shop employee who had accepted the pawn and issued the ticket. Mr. Houser explained that, in order to issue a ticket, he had to see a Tennessee identification card containing a photograph of the customer. The identification card presented to him in this instance contained the same information found on the identification card which the Defendant was carrying when he was arrested, and this information was reflected on the pawn ticket. Mr. Houser explained that he verified the identification of the person presenting the card by comparing the photograph to the person. The police were able to recover two of the rings from the pawnshop, and Mr. Houser confirmed that these two rings were the ones taken from the man who identified himself as William Rhea Jackson. The victim and her daughter both identified these rings at trial as belonging to the victim.

Dennis Gordon testified on behalf of the Defendant. Mr. Gordon testified that he had known the Defendant for a "long time." He and the Defendant frequently spent time together in the area of South Eleventh Street. Nearby was a Family Dollar store. Mr. Gordon explained that his girlfriend worked in the Family Dollar store and that he was in the store with the Defendant on several occasions.

Natika Spann, Mr. Gordon's girlfriend, testified that she worked in the Family Dollar store. She explained that the store carried Christmas popcorn tins like the one in the victim's bedroom from which the Defendant's fingerprint had been recovered. She also testified that she had never seen the Defendant in the store.

Sharon Jackson, the Defendant's sister, testified that her brother had lived in the South Eleventh Street neighborhood prior to his arrest. She explained that the Family Dollar store was just a few blocks from his apartment. She further testified that she had been in the Family Dollar with the Defendant at Christmastime in 1999.

The victim was called by the State in rebuttal, and testified that she cleaned the popcorn tin every time she dusted.

### MOTION TO SUPPRESS

In his first issue the Defendant contends that the trial court erred by denying his motion to suppress the statements he allegedly made to Det. Lawson during their interview. The Defendant alleged in his motion that "the State cannot show that [he] made a knowing and intelligent waiver of his right to remain silent or his right to an attorney." At the hearing on the motion, Det. Lawson testified that she read the Defendant his rights not once, but twice, before informing him about the evidence against him. She stated that the Defendant refused to sign the rights waiver form, but agreed to speak with her if she did not record the conversation. When presented with the evidence against him, the Defendant stated that he had "fucked up" and "messed [his] life up."

Det. Lawson prepared a Supplement Report which states, in pertinent part, that the Defendant

asked what had been said and I informed him that I would tell him when we got into the interview room. I began the interview by reading [the Defendant] his Miranda rights. He said he wanted to know what was up before he spoke with us. I informed him that I would tell him as soon as I got some information from him regarding his full name and other things needed for the rights waiver. After this information was obtained, I began advising him of the allegations. I then read [the Defendant] his rights and he agreed to talk with us but did not want to sign the waiver. When I again confronted him with the evidence, he looked first at Det. Sutherland and then towards myself and made the statement "I fucked up." He also made the statement that "he had messed up his life." After talking with him about additional evidence that I had, he said that he did not want to talk about it anymore.

Defense counsel used this report in his cross-examination of Det. Lawson, pointing out that it seemed to indicate that she did not read the Defendant his rights until after she "advis[ed] him of the allegations." Det. Lawson responded that "[a]dvising him of all the allegations and advising him of what all I have in my case file is two, different things." She explained that, after the first reading of the Defendant's Miranda rights, the Defendant leaned back in his chair and crossed his arms. At that point, she told him what he was being accused of and read him his rights the second time. She

testified that, after the second reading, the Defendant "said he would talk to us, but he wouldn't -- he wouldn't wanna sign the waiver."

The trial court took the Defendant's motion under advisement and subsequently issued an eloquent and well-researched order, holding "that based on the totality of the circumstances . . . the [D]efendant knowingly and intelligently waived his Miranda rights." Accordingly, the trial court denied the Defendant's motion to suppress.

On appeal, the Defendant contends that Det. Lawson confronted him with evidence before reading him his Miranda rights and thereby "attempted to elicit incriminating information" prior to advising him of his constitutional rights. The Defendant contends that this tactic was unconstitutional and that the State has failed to establish that he waived his rights voluntarily, knowingly, and intelligently.

"[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Here, the trial court found that Det. Lawson properly advised the Defendant of his Miranda rights before questioning him. The evidence does not preponderate against this finding. Det. Lawson testified that she read the Defendant his Miranda rights prior to advising him of the evidence that the police had collected which implicated him in the crimes. She also testified that the Defendant indicated that he understood his rights. Det. Lawson's Supplement Report does not contradict this testimony. Indeed, the Supplement Report is consistent with Det. Lawson's testimony that she read the Defendant his rights not once, but twice. According to the report and her testimony, she advised him of the charges against him after the first reading. She then read him his rights a second time and described the evidence against him. The report reflects, consistent with Det. Lawson's testimony, that the Defendant refused to sign the waiver but did agree to speak with the detectives. This is further bolstered by the rights waiver form itself, on which Det. Lawson wrote "Mr. Jackson did not wish to sign the waiver but agreed to talk with myself and Det. Keith Sutherland."

We acknowledge, of course, that the warnings mandated by the Miranda decision must be given to a suspect prior to custodial interrogation. See Miranda v. Arizona, 384 U.S. 436, 479 (1966). Furthermore, the term "interrogation" "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). However, "[t]he disclosure of incriminating evidence to a suspect . . . does not necessarily constitute an interrogation within the meaning of Innis." State v. Maraschiello, 88 S.W.3d 586, 603 (Tenn. Crim. App. 2000). Furthermore, the record in this case supports the trial court's finding that Det. Lawson informed the Defendant of his Miranda rights before proceeding with any attempt to elicit information from him and further supports the trial court's conclusion that the Defendant effectively waived his Miranda rights. See State v. Elrod, 721 S.W.2d 820, 823 (Tenn. Crim. App. 1986) (finding that the "[l]ack of an explicit written waiver of the right to remain silent or the right to counsel after Miranda warnings does not per se require exclusion of a confession if waiver can be found from facts and surrounding circumstances.") Accordingly, this issue is without merit.

**FINGERPRINT TESTIMONY**

The Defendant's theory in this case was that he was not the perpetrator of the crimes against the victim. To explain his thumbprint on the popcorn tin located in the victim's bedroom, the Defendant offered proof that the nearby Family Dollar store sold such tins and that he could have touched the tin while it was still in the Family Dollar. Apparently, the State expected this line of proof because, during the State's case in chief, the prosecutor asked Officer Charles Anglin, who lifted the latent print from the tin at the victim's house, how evaporation affected fingerprints. Officer Anglin responded as follows:

> Okay. Some of - uh - the schools that I've been to - uh - there are a couple of schools that I've gone to, discussed that. It depends on the atmospheric conditions. Uh - the . . . instructor at - uh - two of the schools that I went to said that if you're in direct sunlight, like a car that's outside in direct sunlight, uh - that absent any contaminants or such, uh - such that delay the drying process . . . four to six hours it would be gone.
>
> Inside, uh - my experience is that - uh - a week to ten days at the - uh - under normal household conditions.

At this point, defense counsel objected that there had not been a proper foundation laid for this testimony. The court sustained the objection and then gave the State the opportunity to lay the necessary foundation. Officer Anglin subsequently testified that he had been assigned to the identification section of the Metro police department's criminal investigation division for sixteen years. His duties with that section included collecting latent fingerprints from crime scenes. His training consisted of working in-house with another officer with experience in crime scene investigation and attending two academic courses to learn about latent fingerprint development. Each of these courses lasted forty hours and included training in the chemical components of fingerprints and factors that could cause their deterioration. He testified that he had sixteen years of experience lifting fingerprints and that he had been involved in lifting thousands of them. He acknowledged that he was not a certified fingerprint examiner.

Following this testimony, the trial court allowed the prosecutor to ask Officer Anglin about the lifespan of a fingerprint. Officer Anglin testified that, in his experience as a police officer working crime scenes, he had not had success lifting fingerprints with the brush and powder method after a week to ten days. The Defendant now contends that Officer Anglin's testimony was inadmissible because he was not properly qualified as an expert witness to render such an opinion and that the State did not show that there was any scientific basis for this testimony. The Defendant also points out that the trial court never specifically designated Officer Anglin as an expert, either during his testimony or in the jury charge. The prosecutor, however, referred to Officer Anglin as an expert in her closing argument.

"Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). This Court will not overturn the trial court's ruling regarding the

admissibility of expert testimony absent an abuse of discretion. See id. We will not find an abuse of discretion unless it appears that the trial court applied an incorrect legal standard or reached a decision which is against logic or reasoning and caused an injustice to the complaining party. See id.

Initially, we disagree with the Defendant's characterization of Officer Anglin's testimony as opinion, expert or otherwise. A close reading of the record reveals that Officer Anglin's specific testimony was about his experiences in the field as a police officer trained in locating latent fingerprints at crime scenes. Significantly, Officer Anglin never offered an opinion as to how long the Defendant's thumbprint had been on the popcorn tin prior to the print being discovered. We do agree with the Defendant, however, that Officer Anglin's testimony was in the nature of expert testimony. Moreover, it is clear from the transcript of the trial that the State elicited this testimony from Officer Anglin for the purpose of causing the jury to draw the inference that the Defendant's thumbprint had been left on the victim's property no more than ten days prior to Officer Anglin's visit to the crime scene.

Under our Rule of Evidence 702, "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Obviously, the fact in issue in this case was how long the Defendant's thumbprint had been on the popcorn tin. The lifting and analysis of fingerprints is a form of specialized knowledge for which it is appropriate to elicit expert testimony. Accordingly, upon the Defendant's objection, the State inquired into Officer Anglin's professional training and background.

After hearing this testimony, the trial court, over defense counsel's objection, allowed the prosecutor to ask Officer Anglin about how long a fingerprint would last before it evaporated. In response to the State's questions, Officer Anglin testified that he had not had success lifting latent fingerprints using the brush and powder method past ten days. During subsequent cross-examination Officer Anglin stated that he had not conducted any scientific experiments to determine how long it takes for a fingerprint to evaporate. He further acknowledged being aware of research that indicated that it was not possible to determine how long a fingerprint had been on an object. He was also aware of cases in which fingerprints had been recovered from items years after having been left.

We turn first to the requirements of Rule 702. Scientific, technical and other specialized knowledge may be testified to where the testimony will "substantially assist the trier of fact to understand the evidence or to determine a fact in issue." The fact in issue about which the State sought to introduce Officer Anglin's testimony was when the Defendant left his fingerprint on the popcorn tin. Obviously, the shorter the lifespan of the Defendant's print, the more likely it was that he left the print during the attack on the victim. The lifespan of a fingerprint is not a matter within the ordinary knowledge of the average layperson. Accordingly, expert testimony about this issue would meet the initial relevance test set forth in Rule 702.

However, as admitted by Officer Anglin, there is no scientific test for determining the lifespan of a fingerprint. Thus, Officer Anglin's testimony was not in the nature of scientific theory and/or methodology, but was rather in the nature of non-scientific "specialized knowledge," to wit, his experience. See State v. Stevens, 78 S.W.3d at 832. Indeed, our supreme court recognized in Stevens that crime-scene analysis, including the gathering and analysis of physical evidence, is generally considered to be a body of specialized knowledge. See id. (citing Simmons v. State, 797 So.2d 1134, 1151 (Ala. Crim. App. 1999)). Nevertheless, such nonscientific testimony must still meet the fundamental requirements of relevance and reliability. See id. Indeed, Rule of Evidence 703 provides in pertinent part that a trial court "shall disallow [expert] testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness."

Our supreme court has indicated that, before allowing expert testimony about nonscientific specialized knowledge,

> the trial court must first make a determination that the witness is qualified by knowledge, skill, experience, training, or education to express an opinion within the limits of the expert's expertise. The determinative factor is whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue.

Stevens, 78 S.W.3d at 834 (citation omitted). Next, the trial court must ensure that the basis for the witness's opinion, whether it is testing, research, studies, or experience-based observations, adequately supports the witness's conclusions. See id. Significantly,

> [t]his "connection" between the expert's conclusion and the underlying data supporting that conclusion is of especial importance when determining the reliability of experience-based testimony, because observations and experiences are not easily verifiable by the court. However, the court may make a finding of reliability if the expert's conclusions are sufficiently straightforward and supported by a "rational explanation which reasonable [persons] could accept as more correct than not correct."

Id. (citation omitted). Finally, the trial court may apply, in its discretion, the factors listed in McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257, 265 (Tenn. 1997), which include (1) whether the evidence about which the expert is testifying has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether the evidence is generally accepted in the community involved in the body of specialized knowledge; and (5) whether the expert's research in the field has been conducted independent of litigation. See State v. Stevens, 78 S.W.3d at 834.

The trial court did not make any specific findings with respect to any of these factors. (In fairness to the trial court, however, we note that the Stevens decision had not been filed as of the time the Defendant's case was tried). The court simply allowed Officer Anglin to testify about his

experience with his attempts to lift prints with the brush and powder method after both the prosecutor and defense counsel questioned the officer about his training and experience in lifting latent fingerprints. The court's allowing Officer Anglin to testify, however, indicates an implicit ruling that he was qualified to answer the questions.

Our review of Officer Anglin's testimony in light of the guidelines set forth in the Stevens decision leads us to conclude that Officer Anglin should not have been allowed to testify about his experience with the period of time during which a latent fingerprint could be recovered with the brush and powder method. We reach this conclusion for two reasons. First, proof about Officer Anglin's failure to lift prints more than ten days old was relevant only if that failure was caused by the passage of time. Here, the only evidence of causation was Officer Anglin's very limited and very vague hearsay testimony about "atmospheric conditions," "the drying process," and "normal household conditions." None of those factors was addressed vis a vis the victim's bedroom. Moreover, Officer Anglin's past efforts at delayed fingerprint recovery were relevant only insofar as they reflected conditions similar to those he encountered at the instant crime scene. There was no testimony to establish any such similarities, however.

Second, the foundation laid for Officer Anglin's testimony on this topic did not ensure that the basis for his observations — his professional experience — adequately supported the conclusion for which the State was eliciting Officer Anglin's testimony: that fingerprints more than ten days old cannot be found with the brush and powder method. Officer Anglin's experience qualified him to testify about how to develop latent fingerprints at crime scenes. It did not qualify him to testify, however, about how long fingerprints last. Although his testimony on this topic was couched in terms of his personal success rate with lifting fingerprints using the powder and brush method, the clear implication of the testimony — and the reasons for the State's inquiry along this line — was to establish that the Defendant's fingerprint had been left on the victim's property no more than ten days before Officer Anglin's visit. Officer Anglin testified that, in his experience, he had not succeeded in the effort to lift latent fingerprints using the powder and brush method after more than ten days had elapsed. There had been no foundation laid, however, to indicate how many times he had attempted to lift prints from a crime scene more than ten days after the crime had been committed. If this number were no more than a dozen, for instance, serious doubt would be cast on the reliability of his data. Moreover, in the context of the State's questions, Officer Anglin's testimony implied that his failure after this period of time was due to evaporation; however, he had no actual data with which to support this conclusion. Obviously, his failure rate after this period of time could have been due to other, unexplored factors. Officer Anglin's reliability would have been much enhanced if he had testified, for instance, that he had conducted controlled tests with fingerprints left at a known time.

Therefore, we conclude that the trial court erred in allowing Officer Anglin to testify concerning the lifespan of fingerprints. Nevertheless, we find this error to be harmless. The exclusion of the challenged testimony would have left the jury with proof that the Defendant's thumbprint was found on a popcorn tin in the victim's bedroom; that the victim remembered having the tin in her possession since the previous Christmas, more than eight months earlier; that she

cleaned the tin every time she dusted; and that she heard her attacker open the tin. To counter this strong circumstantial evidence of the Defendant's identity as the perpetrator, the Defendant offered proof that he had been in a neighborhood store which sold tins like the one belonging to the victim at about the same time the victim obtained the tin. Based on this evidence, we have no trouble determining that the jury would have reached the same conclusion about the Defendant's presence in the victim's home, even without the benefit of Officer Anglin's testimony about his inability to lift latent prints after ten days. Accordingly, this issue is without merit.

## TESTIMONY ABOUT PHOTOGRAPHIC LINE-UP

The victim never identified the Defendant at trial as her assailant, nor did she testify about her review of the photographic line-up presented to her by Det. Lawson. Rather, Det. Lawson testified that she showed a photographic line-up of six men, one of whom was the Defendant, to the victim. According to Det. Lawson, the victim was not able to identify her attacker as one of the men depicted in the line-up. Rather, Det. Lawson testified, the victim told her that she could "narrow it down" to three of the men, stating that it was one of the three. The Defendant contends that Det. Lawson's testimony was inadmissible hearsay. The State responds that this testimony was properly admitted as a prior identification.

Det. Lawson's testimony about what the victim told her during the line-up viewing was hearsay. See Tenn. R. Evid. 801(c). Hearsay is generally not admissible. See Tenn. R. Evid. 802. However, hearsay may be admissible if it consists of "[a] statement of identification of a person made after perceiving the person if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement." Tenn. R. Evid. 803(1.1). Here, the victim-declarant testified at trial and was subject to cross-examination. Thus, the issue before this Court is whether her statement to Det. Lawson meets the definition of an identification.

We hold that it does not. The victim's statement to Det. Lawson did not identify the Defendant as her attacker; rather it indicated that the Defendant might have been her assailant, as might two of the other five men whose photographs were shown to her. Not only does the victim's statement not qualify as a prior identification, it barely meets the definition of relevant evidence. See Tenn. R. Evid. 401. Moreover, insofar as it may be marginally relevant, it should have been excluded because its probative value is substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403. Accordingly, the trial court erred by allowing Det. Lawson to testify about the victim's response to the photographic line-up.

However, we conclude that the error was harmless. See Tenn. R. App. P. 36(b). The most significant proof of the Defendant's attack on the victim consisted of his thumbprint found at the scene and his possession of the victim's jewelry later on the day of the attack. It was clear to the jury that the victim did not recognize the Defendant at trial. Accordingly, we are confident that the jury put very little weight on the contested statement and that the erroneous admission of this evidence did not affect the jury's verdict or prejudice the judicial process. This issue is, therefore, without merit.

**IMPROPER PROSECUTORIAL CLOSING ARGUMENT**

During the State's closing argument, the prosecuting attorney explained that a criminal defendant has the right to not put on a defense, but if he or she chooses to do so, "that defense is scrutinized and closely examined by the jury, just like the State's proof." She continued, stating the following:

> What is the defense in this case . . . in the face of the overwhelming evidence presented by the State? This man . . . was found . . . his fingerprint on this can in Ms. Robinson's bedroom that she testifies specifically she heard the man open . . . the can. He is confronted by an officer and he makes admissions, shows his consciousness of his own guilt, is picked as one of three possible people out of a photo ID lineup by [the victim], and is found to have pawned her jewelry that afternoon.
>
> This is remarkably overwhelming proof of the defendant's guilt. <u>And, what does he have to say in his defense?</u>

Upon hearing this utterance by the State's attorney, defense counsel immediately objected and moved for a mistrial. The trial court denied the Defendant's motion but issued no curative instructions to the jury. However, after the bench conference concerning the Defendant's objection was concluded, the prosecutor resumed her argument with the rhetorical question, "So, in the face of the overwhelming evidence of the State, what is the defense? The defense is a wholly, unbelievable . . . unreliable and inexplicably . . . convoluted defense that he must have touched that popcorn can at some other time." The Defendant now contends that the trial court erred in denying his motion for a mistrial. He argues that the prosecutor's statement was an impermissible comment upon his constitutional rights not to testify, and improperly shifted the State's burden of proof to him.

A trial court has substantial discretionary authority in determining the propriety of final argument. <u>See</u> <u>Coker v. State</u>, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). Although counsel is generally given wide latitude, a trial court must restrict any improper commentary. <u>See</u> <u>id.</u> It is never proper for a prosecuting attorney to comment upon a defendant's decision not to testify, and to do so constitutes misconduct. <u>See</u> <u>State v. Thornton</u>, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999). Even if prosecutorial argument does constitute misconduct, however, whether it amounts to reversible error depends on whether it had a prejudicial effect upon the jury's verdict. <u>See</u> <u>id.</u>

The factors to aid us in making this determination are set forth in <u>Judge v. State</u>, 539 S.W.2d 340, 344 (Tenn.Crim.App.1976). The <u>Judge</u> factors, later adopted by our supreme court in <u>State v. Buck</u>, 670 S.W.2d 600, 609 (Tenn.1984), require this Court to consider:

> (1) the conduct complained of, viewed in context and in light of the facts and circumstances of the case;
> (2) the curative measures undertaken by the trial court and the prosecutor;

(3) the intent of the prosecutor in making the improper statement;

(4) the cumulative effect of the improper conduct and any other errors in the record; and

(5) the relative strength or weakness of the case.

See Judge, 539 S.W.2d at 344.

The first Judge factor requires us to consider the prosecutor's comments in context and in light of the facts and circumstances of the case. See Judge, 539 S.W.2d at 344. The State's proof in this case was circumstantial in nature: no eyewitness or confession affirmatively identified the Defendant as the perpetrator. However, the circumstantial evidence was strong: the Defendant's thumbprint was found at the scene and the Defendant pawned some of the victim's jewelry on the afternoon of the attack. When confronted with the evidence against him, the Defendant stated that he had "fucked up" and "messed up" his life. The Defendant's theory of defense was that he was not the perpetrator, and that his thumbprint had been innocently placed on the victim's property some months before the crimes. In other words, the Defendant chose to meet circumstantial evidence with circumstantial evidence, rather than take the stand. The prosecutor's comment, arguably implying that the Defendant should have testified in order to overcome the State's proof, was therefore improper.

The trial court did not issue a contemporaneous curative instruction to the jury. After the bench conference following defense counsel's objection, the prosecutor simply resumed her argument with the rhetorical question, "So, in the face of the overwhelming evidence of the State, what is the defense? The defense is a wholly, unbelievable . . . unreliable and inexplicably . . . convoluted defense that he must have touched that popcorn can at some other time." Subsequently, during its charge to the jury, the trial court instructed the jury that

> The defendant has not taken the stand to testify as a witness, but, you should place no significance on this fact. The defendant is presumed innocent and the burden is on the State to prove his guilt beyond a reasonable doubt. He is not required to take the stand in his own behalf, and his election not to do so cannot be considered for any purpose against him, nor can any inference be drawn from such fact.
> . . .
> The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden never shifts, but, remains on the State throughout the trial of the case. The defendant is not required to prove his innocence.

While a contemporaneous jury instruction would have been preferable, the prosecutor's subsequent question made clear that she was no longer focusing on the Defendant's failure to testify, but rather on the credibility of his defense.

The third factor is the prosecutor's intent in making the questioned comment. Here, the prosecutor was intending to demonstrate that the Defendant's theory of defense was specious when

-12-

compared to the strength of the State's case. Of course, every prosecutor intends to raise questions about the credibility of proof put on by a criminal defendant; nevertheless, it is incumbent upon prosecutors to not couch their criticisms in terms of what the defendant has failed to say.

The fourth factor is the cumulative effect of the improper comment and other errors in the record. While we have found other errors in this record, we find that these errors were not enhanced or magnified by the prosecutor's improper comment. We find that the prosecutor's comment, in the context of the entire closing argument by the State and the totality of the evidence presented to the jury, had little or no effect on the jury. The jury was instructed by the court at the close of argument that the Defendant was presumed innocent; bore no burden to prove his innocence; and that no negative inference could be drawn from his failure to testify. The prosecutor did not repeat her mistake.

The fifth and final Judge factor is the relative strength or weakness of the State's case. While we disagree with the prosecutor that the State's case was "overwhelming," we do find that the State made out a strong circumstantial case against the Defendant.

Considering all of the Judge factors, we hold that the prosecutor's remark was improper, but does not require reversal. Once again, however, this Court cautions the State against making such gratuitous and improper comments, and reminds prosecutors that "'[r]emarks which skirt the edges of impermissible comment are neither desirable nor worth the risk of reversal of what may well be a thoroughly deserved conviction.'" State v. Copeland, 983 S.W.2d 703, 709 (Tenn. Crim. App. 1998) (quoting Taylor v. State, 582 S.W.2d 98, 101 (Tenn. Crim. App. 1979)). The Defendant is not entitled to a new trial on this basis.

## SUFFICIENCY OF THE EVIDENCE

In his fifth issue, the Defendant asserts that the evidence is not sufficient to sustain any of his convictions. Specifically, he contends that "the State failed to prove beyond a reasonable doubt his identity as the perpetrator of the crimes in question." We respectfully disagree.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. See Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

Of course, the identity of the perpetrator is an essential element of any crime. See State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975). Sufficient proof of the perpetrator's identity may, however, be proven through circumstantial evidence alone. See State v. Darnell, 905 S.W.2d 953, 961 (Tenn. Crim. App. 1995). As this Court has previously noted, however, for circumstantial evidence alone to be sufficient to support a conviction,

> the circumstantial evidence must be not only consistent with the guilt of the accused but it must also be inconsistent with innocence and must exclude every other reasonable theory or hypothesis except that of guilt. In addition, "it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that [the defendant] is the one who committed the crime."

State v. Bigsby, 40 S.W.3d 87, 90 (Tenn.Crim.App.2000) (citations omitted). While following these guidelines, this Court must remember that the jury decides the weight to be given to circumstantial evidence and that "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn.1958) (citation omitted).

In this case, circumstantial evidence that the Defendant committed the instant crimes includes his thumbprint recovered at the scene of the crime; the victim's testimony that she had had the popcorn tin on which the Defendant's thumbprint was found for approximately a year, that she heard the tin being opened by her attacker, and that she cleaned the tin every time she dusted; the pawning of jewelry identified as the victim's on the afternoon of the attack by a person using the Defendant's identification card, including testimony that the pawn shop employee accepting the pawn checked the photograph on the card against the appearance of the person presenting it; the Defendant's statement to the police when presented with some of the evidence against him that he had "fucked up" and "messed [his] life up"; and testimony by the Defendant's sister that he resided in the neighborhood in which the victim lived. These facts, taken together, are, we find, sufficient to establish the Defendant's identity as the perpetrator of these crimes beyond a reasonable doubt. The Defendant's contention in this regard is, therefore, without merit.

## CONSTITUTIONALITY OF KIDNAPPING CONVICTION

In his sixth issue the Defendant argues that his aggravated kidnapping conviction must be reversed and dismissed pursuant to our supreme court's opinion in State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). In Anthony our supreme court held that a kidnapping conviction violates due process if it is essentially incidental to the commission of another offense. See id. at 306. In Anthony, the defendants confined employees of a restaurant during the course of committing a robbery. The defendants were convicted of both armed robbery and aggravated kidnapping. Our supreme court affirmed this Court's reversal of the aggravated kidnapping convictions on the basis that the confinements were "essentially incidental" to the robbery and did not "substantially increase the risk of harm" to the victims. See id. at 306-08. The Defendant contends that the same result should obtain here because "[t]he proof established that the victim was forced into her bedroom, detained, and tied up solely to facilitate the robbery, theft, rape, and attempted rape."

We respectfully disagree. Aggravated kidnapping as charged in this case is defined as "false imprisonment . . . committed: . . . [t]o facilitate the commission of any felony or flight thereafter." Tenn. Code Ann. § 39-13-304(a)(1). A person commits false imprisonment when he or she "knowingly . . . confines another unlawfully so as to interfere substantially with the other's liberty." Id. § 39-13-302(a). In this case, the Defendant pushed the victim down on her bed and covered her head with a pillow after he forcibly entered her home. He left her lying there while he rummaged through her house. He returned, raped her, and again left the room. He returned a second time, robbed the victim of her jewelry, attempted to rape her, pulled a pillowcase over her head and tied her hands behind her back. He raped her a second time and then left the room again. When he again returned to the bedroom, he tied the victim's feet before leaving her home.

Irrespective of whether the victim's initial confinement to her bedroom was "essentially incidental" to the Defendant's subsequent offenses, there is no question but that the Defendant's tying of the victim's hands and feet was not incidental to the majority of his crime spree. By the time the Defendant tied the victim's hands, he had already committed the aggravated burglary, robbery, theft, one of the rapes and the attempted rape. By the time he tied her feet, he had committed all of the accompanying felonies. This last act of confinement was clearly to facilitate his flight because after he tied the victim's feet, he asked her if she was going to have company. When she said that she was expecting company "now," the Defendant fled the victim's home.

A few years after the Anthony decision, our supreme court reconsidered that opinion and concluded that

> [t]he Anthony decision should only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of [the accompanying felony]. Accordingly, any restraint in addition to that which is necessary to consummate [the accompanying felony] may support a separate conviction for kidnapping.

-15-

State v. Dixon, 957 S.W.2d 532, 534-35 (Tenn. 1997) (emphases added). For determining whether the separate kidnapping conviction withstands due process scrutiny, the court set out a two-prong inquiry:

> (1) whether the . . . confinement was beyond that necessary to consummate the associated felony; and
> (2) whether the additional . . . confinement: (a) prevented the victim from summoning help; (b) lessened the defendant's risk of detection; or (c) created a significant danger or increased the victim's risk of harm.

Id. at 535. In the instant case, the Defendant's actions in tying the victim's hands and feet was clearly an additional confinement which was beyond that necessary to consummate the other felonies. Moreover, the Defendant's actions in tying the victim up certainly increased her risk of harm and gave the Defendant at least some additional time in which to effect his flight, thereby lessening his risk of detection. The victim was not able to call the police until after she was able to obtain the assistance of a neighbor across the street to untie her hands. Accordingly, the Defendant's aggravated kidnapping conviction does not violate due process, and this issue is therefore without merit.

## LESSER-INCLUDED OFFENSES

In his seventh issue, the Defendant contends that his convictions for robbery and two counts of rape must be reversed and those charges retried because the trial court did not properly instruct the jury on lesser-included offenses. The State argues that the trial court did not err in its instructions and maintains that, even if the court did err, such error is harmless beyond a reasonable doubt.

The Defendant was charged with, inter alia, two counts of aggravated rape and one count of robbery. With respect to these counts, the trial court instructed the jury on the offense of rape as a lesser-included offense of aggravated rape. The trial court did not instruct the jury on any lesser-included offense of robbery. The Defendant contends that the trial court should also have instructed the jury on sexual battery and assault as additional lesser-included offenses of aggravated rape, and on theft as a lesser-included offense of robbery.

Trial courts are under a duty to "'instruct the jury on all lesser-included offenses if the evidence introduced at trial is legally sufficient to support a conviction for the lesser offense.'" State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999) (quoting State v. Langford, 994 S.W.2d 126, 128 (Tenn. 1999)). In Burns, our Supreme Court adopted a new three-part test for determining whether an offense is a lesser-included offense. See 6 S.W.3d at 466-67. Under the new test, which was largely derived from the Model Penal Code, an offense is a lesser-included offense if:

> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

-16-

(1) a different mental state indicating a lesser kind of culpability; and/or

(2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Id. If the trial court determines under this test that there is one or more lesser-included offenses of the charged offense, then the trial court must determine whether the evidence adduced at trial justifies an instruction on the lesser-included offenses. See id. at 467. This determination is to be made using a two-part analysis:

First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Id. at 469. If the answer to these two inquiries is affirmative, then it is error for the trial court to not give an instruction on the lesser-included offense. The error is not negated simply because the evidence is sufficient to convict on the greater offense. See State v. Bowles, 52 S.W.3d 69, 75 (Tenn. 2001). Moreover, "[a] defendant need not demonstrate a basis for acquittal on the greater offense to be entitled to an instruction on the lesser offense." State v. Allen, 69 S.W.3d 181, 187 (Tenn. 2002). Finally, "[t]he trial court must provide an instruction on a lesser-included offense supported by the evidence even if such instruction is not consistent with the theory of the State or of the defense. The evidence, not the theories of the parties, controls whether an instruction is required." Id. at 187-188.

"An erroneous failure to give a lesser-included offense instruction will result in reversal unless a reviewing court concludes beyond a reasonable doubt that the error did not affect the outcome of the trial." Id. at 189. Stated another way, we must determine whether there is a reasonable possibility that reasonable minds would have convicted the Defendant of the omitted lesser-included offenses had they been given the opportunity. In making this determination, we must conduct a thorough examination of the record, including the evidence presented at trial, the

-17-

Defendant's theory of defense, and the verdict returned by the jury. See id. at 191. We do not make any judgments on the credibility of the evidence, nor is it necessary that we find a basis for acquitting the Defendant of the greater offense. See Bowles, 52 S.W.3d at 80. Furthermore, the decision to convict on a lesser-included offense should not be taken from the jury simply because the element distinguishing the greater offense from the lesser offense is "uncontroverted." See Allen, 69 S.W.3d at 189.

We turn now to the Defendant's contention that the trial court should have charged the jury on sexual battery and assault as lesser-included offenses of aggravated rape. As charged in this case, aggravated rape is committed upon the unlawful sexual penetration of a victim by the defendant where the defendant causes bodily injury to the victim. See Tenn. Code Ann. § 39-13-502(a)(2). The lesser-included offense of rape is the unlawful sexual penetration of the victim by the defendant accomplished by force or coercion. See id. § 39-13-503(a)(1). Unlawful sexual penetration includes digital penetration of the victim's rectum. See id. § 39-13-501(7). Sexual battery, on the other hand, is unlawful sexual contact with a victim by the defendant accomplished by force or coercion. See id. § 39-13-505(a)(1). "Sexual contact" is defined as including the intentional touching of the victim's intimate parts, "if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(7). Our supreme court has determined that sexual battery is a lesser-included offense of aggravated rape under part (b) of the Burns calculus. See Bowles, 52 S.W.3d at 77.

Given that sexual battery is a lesser-included offense of aggravated rape, we must determine whether the evidence in this case warranted instructions on this offense. Such an instruction was necessary only if the Defendant's actions in penetrating the victim's rectum with his finger "can be reasonably construed as being for the purpose of sexual arousal or gratification." We conclude that such a construction, under all of the facts of this case, is reasonable. We acknowledge that there is no proof that the first penetration was accompanied by any words or conduct indicative of the Defendant's purpose in doing what he did. However, he subsequently attempted to rape the victim by putting his penis in her face and demanding, repeatedly, that she fellate him. When she refused, the Defendant rubbed his penis on her body. He then repeated his digital penetration of the victim's rectum.

Had the proof established only the digital penetrations and included no evidence of conduct so blatantly indicative of seeking sexual arousal or gratification as the repeated demand of fellatio followed by penile rubbing, it would be difficult to find sufficient proof in the record to support an instruction on sexual battery. The Defendant's entire course of conduct toward the victim, however, would have permitted the fact-finder to reasonably conclude that the digital penetrations were for the purpose of sexual arousal or gratification. Accordingly, it was error for the trial court to have failed to instruct the jury on the lesser-included offense of sexual battery on the two counts of aggravated rape.

We turn now to the question of whether the State has demonstrated that the trial court's error was harmless beyond a reasonable doubt. The only proof of sexual penetration in this case was the

victim's testimony. There was no corroborative proof of any sort. The victim did not seek medical attention after the attack. Thus, the Defendant's convictions of rape rest solely upon the testimony of the victim. If the record demonstrates that the jury had questions about the credibility of the victim's testimony, then there is a reasonable possibility that the jury would have convicted the Defendant of sexual battery rather than rape, had the jury been given that opportunity.

In this case, as noted above, the only proof of the Defendant's sexual penetration of the victim was her testimony. Significantly, the jury acquitted the Defendant of the original charge of aggravated rape. In this case, the element distinguishing aggravated rape from rape, of which the jury convicted the Defendant, was bodily injury to the victim. The victim in this case testified that the Defendant's actions caused her pain in her hips, chest and right side which lasted for a period of three months. She explained that this pain was caused by the Defendant getting on top of her, "crush[ing]" her. The proof established that the Defendant was much larger than the victim. This proof was sufficient to establish "bodily injury" as defined in our Criminal Code. See Tenn. Code Ann. § 39-11-106(a)(2). Nevertheless, the jury did not convict the Defendant of the aggravated rapes with which he was charged, which included the element of bodily injury. One explanation for this is that the jury simply did not find credible the victim's testimony on this element.

Given the jury's apparent rejection of at least some of the victim's testimony, we cannot conclude beyond a reasonable doubt that the jury would not have convicted the Defendant of sexual battery rather than rape had it been presented with that option. Accordingly, the trial court committed reversible error in failing to instruct the jury on sexual battery as a lesser-included offense of aggravated rape, and the Defendant must therefore be retried on the two charges of rape.

The State refers us to the decision in State v. Michael Elvis Green, No. W2001-00455-CCA-R3-CD, 2002 WL 1482680 (Tenn. Crim. App., Jackson, Mar. 8, 2002), appeal denied (Tenn. 2002), in which a panel of this Court found that the trial court's failure to instruct the jury on the lesser-included offense of sexual battery where the defendant was charged with rape, was harmless beyond a reasonable doubt. In that case, however, the defendant's theory of defense was that the victim consented to the sexual penetration, not that he was not the perpetrator. Moreover, there was medical and DNA proof corroborating the victim's testimony that she had been sexually penetrated. Thus, in the Green case, the jury was not relying solely on the victim's testimony in order to determine whether the defendant had committed the crime charged. For that reason, we find the Green case to be distinguishable from the instant case, and therefore inapposite.

We also agree with the Defendant that an assault by intentionally or knowingly causing physical contact with another which a reasonable person would regard as extremely offensive or provocative, see Tenn. Code Ann. § 39-13-101(a)(3), is a lesser-included offense of rape. See State v. Haskel D. Finch, No. M2001-00340-CCA-R3-CD, 2002 WL 1204931, at *15 (Tenn. Crim. App., Nashville, June 5, 2002), appeal denied (Tenn. 2002). Accordingly, on retrial, the trial court should issue this instruction if the evidence warrants it.

We turn now to the charge of robbery. A robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Obviously, because robbery is defined in terms of theft, the crime of theft is a lesser-included offense of robbery under part (a) of the Burns calculus. See also Bowles, 52 S.W.3d at 80. Because the evidence proving a robbery necessarily proves a theft, it is error for a trial court not to instruct on the lesser-included offense of theft when the evidence adduced at trial is sufficient to support a conviction of robbery. See id. That was the case here. Accordingly, the trial court erred when it did not instruct the jury on the lesser-included offense of theft. See also Allen, 69 S.W.3d at 188 (noting that, "[a]s a general rule, evidence sufficient to warrant an instruction on the greater offense also will support an instruction on a lesser offense under part (a) of the Burns test. In proving the greater offense the State necessarily has proven the lesser offense because all of the statutory elements of the lesser offense are included in the greater.")

In Bowles, our supreme court considered a similar situation in which the jury convicted the defendant of robbery, but had not been given an instruction on the lesser-included offense of theft. The evidence was sufficient to support the robbery conviction. Nevertheless, the court found that the trial court committed reversible error when it failed to give the instruction on theft. In so finding, the court explained:

> Theft is committed if, "with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn.Code Ann. § 39-14-103 (1997). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn.Code Ann. § 39-13-401(a) (1997). Thus, it is the use of "violence" or "fear" that elevates a theft to robbery. Violence is defined as "physical force unlawfully exercised so as to injure, damage or abuse." Fitz, 19 S.W.3d at 217. "The fear constituting an element of [robbery] is fear of present personal peril from violence offered or impending." Britt v. State, 26 Tenn. (7 Hum.) 45 (1846). It must be a fear of "bodily danger or impending peril to the person," id., which intimidates and promotes submission to the theft of the property. Either the existence of "violence" or "fear" will heighten the offense to a robbery. James v. State, 215 Tenn. 221, 385 S.W.2d 86, 88 (1964).
>
> Based on the testimony describing the violent acts which occurred in [the victim's] presence, including the admission of [the defendant] himself that he grabbed [another victim] and threw her to the floor, we conclude that the evidence was sufficient to support [the defendant's] conviction for robbery. In proving robbery, however, the State also proved theft, for all of the elements of theft are included within the elements of robbery. Thus, evidence existed which would support an instruction on the lesser-included offense of theft. As established above, it is not necessary that [the defendant] demonstrate a rational basis for acquittal on the robbery charge before theft could be submitted to the jury as a lesser-included offense; he merely must demonstrate that evidence also exists which rational minds could accept as to the offense of theft. Because all of the elements of theft are

-20-

supported by the evidence, it was error for the trial court not to instruct the jury regarding that offense. Moreover, while it is certainly possible that the jury would have convicted [the defendant] of robbery even if it had been given an instruction concerning theft, we cannot say that the State has demonstrated beyond a reasonable doubt that the result would not have been different had a theft instruction been given.

52 S.W.3d at 80.

Under our supreme court's reasoning in Bowles, we believe that we must hold that the trial court in this case likewise committed reversible error in failing to instruct the jury on the lesser-included offense of theft with respect to the robbery charge. The only proof distinguishing robbery from theft in this case was the victim's testimony that the Defendant forced her onto her bed, forcibly removed her jewelry, and that his actions while in her house made her fear that he was going to "put [her] to sleep." It is, of course, possible that the jurors had questions concerning the victim's credibility on these points. As discussed above, the jury acquitted the Defendant of the charges of aggravated rape, which required a finding of bodily injury. If the jury rejected the victim's testimony about her injuries, then there is also a reasonable possibility that it would have rejected other portions of her testimony, as well. Accordingly, we cannot conclude that the trial court's error is harmless beyond a reasonable doubt. Therefore, we conclude that the trial court committed reversible error in failing to instruct the jury on theft as a lesser-included offense of robbery, and the Defendant must therefore be given a new trial on the charge of robbery.

We take this opportunity to express our concern for the special difficulties that a retrial will impose upon the victim in this case. A second trial is frustrating for everyone involved. We note, however, that the victim in this case, already at an advanced age at the time of the first trial, did not testify at the sentencing hearing because, in the prosecutor's words, "she just can't take any more." Nevertheless, our law is now clear that a criminal defendant has a constitutional right to have the jury charged on all lesser-included offenses. See State v. Ely, 48 S.W.3d 710, 726-27 (Tenn. 2001). This Court is charged with upholding the constitutional rights of every criminal defendant, even though doing so will cause additional difficulties for the victims and their families. This case illustrates, to a painful degree, the unfortunate consequences that accrue upon a trial court's failure to charge all lesser-included offenses required under the law.

**SENTENCING**

In his final issue, the Defendant contends that the trial court erred in its application of two enhancement factors, thereby imposing terms for his felony convictions that are excessive. He also argues that the trial court erred in ordering some of his sentences to run consecutively.

When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn.

1991). The burden is upon the appealing party to demonstrate that the sentence is improper. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; see also Ashby, 823 S.W.2d at 169.

When conducting a de novo review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Brewer, 875 S.W.2d 298, 302 (Tenn. Crim. App. 1993); State v. Thomas, 755 S.W.2d 838, 844 (Tenn. Crim. App. 1988).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. See State v. Pike, 978 S.W.2d 904, 926-27 (Tenn. 1998); State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The Defendant was sentenced as a Range I offender. The Defendant was convicted of aggravated burglary, a Class C felony;[1] robbery, a Class C felony;[2] two counts of rape, a Class B felony;[3] attempted rape, a Class C felony;[4] and aggravated kidnapping, a Class B felony. See Tenn. Code Ann. § 39-13-304(b)(1). The Range I sentence for Class B felonies is eight to twelve years. See id. § 40-35-112(a)(2). The Range I sentence for Class C felonies is three to six years. See id. § 40-35-112(a)(3). The presumptive sentence for each of these felonies is the minimum in the range, increased by applicable enhancement factors and decreased by applicable mitigating factors. See id. § 40-35-210(c), (e). The trial court sentenced the Defendant to five years for the aggravated burglary; five years for the robbery; twelve years for one of the rapes; ten years for the other rape; five years for the attempted rape; and twelve years for the aggravated kidnapping.

In determining the terms to impose for each of these felony convictions,[5] the trial court applied four enhancement factors:

---

[1] See Tenn. Code Ann. § 39-14-403(b).

[2] See id. § 39-13-401(b).

[3] See id. § 39-13-503(b).

[4] See id. §§ 39-13-503(b), 39-12-101, 39-12-107(a).

[5] The Defendant was also convicted of misdemeanor theft and sentenced to eleven months, twenty-nine days for that offense, a sentence about which the Defendant does not complain.

-22-

(a) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
(b) A victim of the offense was particularly vulnerable because of age or physical or mental disability . . .;
(c) the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; [and]
(d) The crime[s] w[ere] committed under circumstances under which the potential for bodily injury to a victim was great.

Tenn. Code Ann. § 40-35-114(2), (5), (9), (17) (Supp. 2002). The trial court placed particular weight on the first and last of these factors.

The Defendant agues that the trial court erred when it enhanced his sentences on the basis that the victim was particularly vulnerable. He points out that, while the victim was eighty-two at the time of the offenses, "there is no suggestion in the record that she suffered from any physical or mental disability." The Defendant relies on State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997), in which our supreme court held that "unless the State produces evidence of physical or mental limitations at the time of the offense, along with proof of the victim's age, it cannot be presumed that the victim was particularly vulnerable based solely on her age."

Our supreme court's decision in Poole also instructs us that whether a victim is "particularly vulnerable" for purposes of the application of this enhancement factor is "'a factual issue to be resolved by the trier of fact on a case by case basis.'" Id. at 96 (quoting State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993)). The State must proffer proof in addition to the victim's age to establish particular vulnerability, but that proof "'need not be extensive.'" Id. at 97. Furthermore, the trial court may consider the natural vulnerabilities attendant to the extreme ends of the aging spectrum by giving additional weight to the age of the victim where the victim is extremely young or old. See id. "Use of the 'particularly vulnerable' enhancement factor is appropriate . . . if the facts show that the vulnerabilities of the victim[] . . . had some bearing on, or some logical connection to, 'an inability to resist the crime, summon help, or testify at a later date.'" State v. Lewis, 44 S.W.3d 501, 505 (Tenn. 2001) (quoting Poole, 945 S.W.2d at 96).

In this case, the trial court found that the victim "is not only eighty-two years old but lived alone. And I think that presented her, in this particular case, in a situation where she was particularly vulnerable because of her age and her living circumstances." Although not noted by the judge, the State introduced proof at trial that the victim stood no more than five feet, two inches tall and weighed no more than one hundred pounds.

We agree with the Defendant that the State did not put on sufficient proof in this case to establish that the victim was "particularly vulnerable because of age or physical or mental disability." Although the victim was of an advanced age, she testified that, prior to the crimes, she bowled regularly. At the time of the trial, she was going out dancing twice a week. The trial court noted that "she's, in some respects -- I don't know if scrappy's the right word, but I think she could take care

of herself, under normal circumstances, that might be her bowling or other activities that she enjoyed prior to this particular episode." Obviously, the victim was at least "spry." Although we are outraged that the Defendant would victimize an elderly citizen who lived by herself, the trial court's reliance on the victim's solo lifestyle was not an appropriate factor for determining that she was "particularly vulnerable" as that term is used in the statute. In short, we conclude that the trial court erred in applying this enhancement factor under the facts and circumstances adduced in this case.

The Defendant next contends that the trial court erred in applying as an enhancement factor that the crimes were "committed under circumstances under which the potential for bodily injury to a victim was great." We agree, insofar as this enhancement factor was applied to the Defendant's sentence for the aggravated burglary conviction. This Court has previously noted that "[t]he General Assembly has seen fit to enhance the punishment for aggravated burglary and . . . [i]n doing so, the General Assembly recognized that the potential for bodily injury to the victim is great when [this] crime[] [is] committed. Thus, a trial court should not apply this factor absent extraordinary circumstances." State v. Smith, 891 S.W.2d 922, 930 (Tenn. Crim. App. 1994). We do not think such extraordinary circumstances are present here.

We also agree with the Defendant that the trial court erred in applying this enhancement factor to his sentences on the robbery, rapes and attempted rape. Our supreme court has indicated that we must look to the acts actually committed during the course of the criminal conduct which constitutes the offenses in order to determine whether there was a great potential for bodily injury. See State v. Carico, 968 S.W.2d 280, 286 (Tenn. 1998). Here, the rapes consisted of the Defendant climbing on top of the prostrate victim and inserting his finger into her rectum. These actions do not, in and of themselves, create a great potential for bodily injury. Similarly, the Defendant's actions in placing his penis in the victim's face did not create a great potential for bodily injury. Nor did the Defendant's actions in removing the victim's jewelry from her hands and neck. Accordingly, the trial court erred in applying this enhancement factor to the Defendant's convictions for aggravated burglary, rape, attempted rape, and robbery.

We find that the trial court did properly apply this enhancement factor to the Defendant's sentence for aggravated kidnapping. The Defendant covered the victim's head, tied her hands and feet, and left her helpless in her bedroom. She could easily have fallen off the bed and broken bones in her attempt to free herself from her restraints. Accordingly, the Defendant's actions in committing this offense created a great potential for bodily injury to the victim.

In sum, we have determined that the trial court erred in applying two enhancement factors to at least some of the Defendant's sentences. Nevertheless, the Defendant is entitled to no relief on the basis of these errors. The trial court properly applied two other enhancement factors to each of the Defendant's sentences, and each of the sentences reflects an appropriate term based on the application of two enhancement factors and only one mitigating factor of "minimal" weight.[6] Accordingly, we leave intact the length of the terms of each of the Defendant's sentences.

---

[6]The trial court applied the Defendant's care of his two children as a mitigating factor.

The Defendant also challenges the trial court's determination that partial consecutive sentences were appropriate. The trial court ordered that the Defendant's sentences for the robbery, the attempted rape, and the aggravated kidnapping be served consecutively to each other and consecutively to the remaining sentences, for an effective sentence of thirty-four years. The trial court ordered these consecutive sentences upon finding that the Defendant is an offender whose record of criminal activity is extensive, see Tenn. Code Ann. § 40-35-115(b)(2), and upon finding him to be a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high. See id. § 40-35-115(b)(4).

The Defendant argues that his record of criminal activity is not "extensive" because his prior convictions are all misdemeanors. While we agree that all of the Defendant's prior convictions are misdemeanors, the trial court noted that, in the presentence report, the Defendant stated that he had used crack cocaine every other day for the ten year period preceding his arrest on the instant charges. The statute does not restrict itself to prior convictions: it addresses the defendant's record of criminal activity. The Defendant's own acknowledged course of criminal conduct is, indeed, extensive. Moreover, the actual length of the Defendant's overall sentence is justly deserved in relation to the seriousness of the offenses and no greater than that deserved for the offenses committed. See Tenn. Code Ann. §§ 40-35-102(1), 103(2); see also State v. Lane, 3 S.W.3d 456, 460 (Tenn. 1999). The trial court did not err in ordering partial consecutive sentences on this basis.

The Defendant also challenges the trial court's determination that he is a "dangerous offender." We first note that consecutive sentences may properly be imposed on the basis of any single one of the seven grounds provided for in the statute. See Tenn. Code Ann. § 40-35-115(b). Thus, even if the trial court erred in finding the Defendant to be a dangerous offender, such error would not entitle the Defendant to relief. However, we find that the record supports the trial court's determination that the Defendant is a dangerous offender. The Defendant violently forced his way into the elderly victim's home, where she lived alone, forced her into her bedroom and onto her bed, kept her face covered, and eventually tied her up. He went on a two hour rampage through her house, violently removed her jewelry from her body, and sexually assaulted her on three separate occasions. He left the victim tied and restrained when he finally fled her home. The Defendant's reprehensible and odious conduct gives this Court no pause in agreeing with the trial court that the Defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Moreover, the Defendant's violent attack upon this victim, whom he did not know, and his long history of drug abuse support the trial court's findings that an extended sentence is necessary to protect the public against further criminal conduct by this Defendant. See State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). The record further supports the trial court's determination that the consecutive sentences reasonably relate to the severity of the offenses committed. See id. The trial court did not err in imposing partial consecutive sentences on this basis.

In sum, the Defendant is entitled to no relief on the trial court's sentencing decisions.

**CONCLUSION**

The Defendant's convictions for robbery and rape are reversed and remanded for a new trial. The convictions for aggravated burglary, attempted rape, aggravated kidnapping, and misdemeanor theft, and the effective twenty-two year sentence for these convictions are affirmed.

_____
DAVID H. WELLES, JUDGE